THE ALTON MANUFACTURING COMPANY, Appellant, *vs.* THE GARRETT BIBLICAL INSTITUTE, Appellee.

*Opinion filed December 22, 1909—Rehearing denied Feb. 4, 1910.*

1. CORPORATIONS—*charter of corporation is the measure of its powers.* The powers which a corporation is permitted to exercise are those, only, which its charter confers upon it, either by express grant or by implication, and the implied powers are recognized and given effect for the purpose of enabling the corporation to exercise the express powers granted.

2. SAME—*implied powers need not be absolutely indispensable to exercise of express power.* An implied power must be directly appropriate to the execution of an express power and not merely remotely related to it; but implied powers are not limited to those absolutely indispensable to the execution of express powers, but include such powers, not expressly prohibited, as are reasonably necessary, by fair intendment, for such purpose.

3. SAME—*corporations, generally, have implied power to borrow money.* Corporations have, generally, the implied power to borrow money if necessary for the purposes of their organization, and when such power exists and debts are contracted thereunder the corporation may execute its notes or other customary evidences of indebtedness.

4. SAME—*when educational corporation may borrow money and issue notes.* Where a charitable corporation organized primarily for educational purposes has express power to purchase, hold and convey property, real, personal and mixed, and to hold, use and manage the same, it has implied power to expend money to purchase real estate for its use and to maintain and repair the same, and if it has no ready funds on hand when it becomes necessary to expend money for such purposes it has implied power to borrow money therefor and give its notes.

5. SAME—*trustees may appoint one of their number an agent to borrow money and give notes.* If a corporation has power to borrow money and issue notes, the trustees of the corporation may appoint one of their number as their agent for that purpose and expressly or impliedly clothe him with power to borrow money for the use of the corporation and give its notes therefor.

6. SAME—*a corporation may ratify act of agent in borrowing money.* Even though an agent of a corporation has not been given express authority to borrow money for the corporation and give notes, yet if the corporation has such power and with knowledge of the facts approves and ratifies the acts of its agent in such re-

spects, it is liable to the same extent as if it had conferred upon the agent express authority to act.

7. SAME—*a corporation is liable if it uses money borrowed by agent.* If a corporation receives the use and benefit of money borrowed by an agent, who gave notes of the corporation therefor, the corporation is liable to the extent of the money it has received and used, although no authority was given or existed in the agent to borrow the money and give the notes.

8. SAME—*a corporation may be liable by acts giving agent apparent authority.* If a corporation having power to borrow money and give notes holds out an agent to the public as possessing authority to exercise such powers the corporation is bound to the extent of the agent's apparent authority; but in such case the party dealing with the agent must have had knowledge, at the time, of the facts giving the color of authority to the agent.

9. BILLS AND NOTES—*when assignee occupies no better position than payee.* An assignee of notes executed in the name of a corporation by an agent, even though he purchases the notes before maturity, cannot hold the corporation liable upon the ground of the agent's apparent authority to borrow money and issue the notes, · if the payee, at the time he dealt with the agent, had no knowledge of the facts relied upon as showing such apparent authority.

10. TRIAL—*court cannot weigh evidence upon motion to direct a verdict.* Upon a motion to direct a verdict in favor of the defendant corporation in an action on notes signed in the name of the corporation by an agent, if there is any evidence tending to show that the corporation authorized such agent to exercise its power to borrow money and issue notes, or that it ratified his acts with knowledge of the facts or used the money obtained on the notes, the court should deny the motion and submit the evidence to the jury.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Municipal Court of Chicago; the Hon. EDWARD A. DICKER, Judge, presiding.

This is an appeal from a judgment of the Appellate Court affirming a judgment of the municipal court of Chicago against appellant for costs. Appellant, plaintiff below, sued the appellee in an action of assumpsit on three promissory notes. One of the notes was dated April 19, 1902, for $5000, payable four years after date. Another one was

for $2000, dated November 15, 1902, payable four years after date, and another one was for $13,000, dated December 9, 1903, payable three years after date. All three of said notes were payable to the order of Everett O. Fisk, and were signed "Garrett Biblical Institute, by Robert D. Shepherd, treasurer." Each of said notes bore interest at the rate of five per cent per annum, payable semi-annually, and each is credited with the payment of all interest accruing down to and including the first installment of interest maturing in the year 1906. All three of the notes were endorsed by Fisk to appellant. The $5000 note was past due at the time of the endorsement and transfer to appellant. The other two were not then due. The declaration consisted of special counts on the three notes, and the common counts. Appellee filed three pleas to the declaration,—the general issue, a plea denying the execution of the notes under oath, and a plea of want of consideration. Issues were joined on these pleas and a trial had before a jury. Appellant, after introducing its preliminary proof, offered in evidence the notes sued upon. They were objected to by counsel for appellee, and a motion was then made by said counsel to direct a verdict in favor of appellee. The objection to the introduction of the notes was sustained and the motion to direct a verdict allowed. In obedience to the directions of the court the jury thereupon returned a verdict finding the issues for appellee. A motion for a new trial was overruled and judgment rendered on the verdict. That judgment has been affirmed by the Appellate Court, and the case is brought to this court by further appeal.

JOHN W. CREEKMUR, and BENTLEY, BURLING & SWAN, for appellant.

TENNEY, COFFEEN, HARDING & SHERMAN, and PAUL BROWN, (HORACE KENT TENNEY, of counsel,) for appellee.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

The first question necessary to be determined is whether the Garrett Biblical Institute, under its charter, was authorized to borrow money for its corporate purposes. The answer to this question must depend upon the provisions of the charter under which the corporation is operating, for the powers which any corporation is permitted to exercise are those, only, which its charter confers upon it, either by express grant or by implication, and the implied powers are recognized and given effect for the purpose of enabling such bodies to exercise the express powers granted. An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has a slight or remote relation to it. (*People ex rel.* v. *Chicago Gas Trust Co.* 130 Ill. 268; 10 Cyc. 1096.) These implied or incidental powers which a corporation possesses in order to carry into effect the legitimate purposes of its creation are not limited to such as are absolutely indispensable to this end, but include such powers, not expressly prohibited by the charter, as are reasonably necessary, by fair intendment, for the accomplishment of such purposes. · (10 Cyc. 1097.)

The Garrett Biblical Institute is a charitable corporation, created primarily for educational purposes. It is expressly empowered to establish and maintain within the bounds of Cook county a biblical institute under the patronage and control of the Methodist Episcopal Church. The conduct and control of the corporation are placed in a board of trustees. The original act or charter under which it was incorporated was passed in 1855 and fixed the number of trustees at five, but by an amendment to the act, passed in 1865, this number was increased to six. The trustees and their successors are elected by the Rock River Annual Conference of the Methodist Episcopal Church,

and in case of a division of the said conference, then the annual conference within the bounds of which the said institute may be located shall elect such trustees.  By section 1 of the act it is expressly declared that appellee "shall be capable, in law, of taking and holding, by gift, grant, devise or otherwise, and of purchasing, holding and conveying, both in law and equity, any estate or interest therein, real, personal or mixed, and shall have power to execute and fulfill all such trusts as may be confided to said corporation, and to take, hold, use, manage, lease and dispose of all such trust property as may in any manner come to said corporation charged with any trust or trusts in conformity therewith."

It will be observed that the power to borrow money and issue notes therefor is not expressly granted to appellee by the terms of its charter.  But the almost universal rule of law is, that corporations possess the implied power to borrow money when necessary to carry out the purposes of their organization, and when such power is possessed and debts contracted thereunder a corporation may execute its notes or other customary evidences of indebtedness therefor.  The authorities on this proposition are very numerous and an extensive collection of them will be found in Thompson on Corporations, (vol. 3, 2d ed. pp. 87, 108,) and in 10 Cyc. 1101; also, this rule is announced by Justice Scholfield in *Ward* v. *Johnson,* 95 Ill. 215.  "This power to borrow is not limited either to particular kinds of corporations or to those organized for any particular purpose, but is possessed practically by all corporations whose business or objects may render it necessary or proper to resort to this method of raising money."  (3 Thompson on Corporations,—2d ed.—sec. 2174.)  And it has been held that educational institutions and eleemosynary corporations may borrow money under this general power or authority.  *Moss* v. *Harpeth Academy,* 7 Heisk. 283; *Hayward* v. *Pilgrim Society,* 21 Pick. 270.

The charter of appellee does, however, grant to it the express power of purchasing, holding and conveying, in law and equity, any estate or interest therein, real, personal or mixed, and the power to hold, use and manage the same. Under this power it cannot be questioned that appellee may expend money for the purchase of real estate for the use of the institute and to maintain and keep it in repair, and it is equally clear that if it did not possess the ready funds at a time when it might be necessary to the purposes of the corporation to make a purchase of real estate or necessary to make expenditures for needed repairs and maintenance of property which it owned, under its charter it possessed the implied power to borrow money for such purposes and give its notes therefor. The trustees having power to borrow money for proper corporate purposes and execute notes therefor, might exercise this authority in a number of ways: (1) They might appoint one of their number as agent of the corporation for that purpose and expressly or impliedly clothe him with authority to borrow money and give notes; (2) where no actual authority has been conferred upon the agent of the corporation to borrow money and give notes but where the agent has done so, and with full knowledge of all the facts the corporation has approved and ratified the acts of the agent, it will be liable to the same extent as if actual authority had been given to perform the acts; (3) where no authority had been given or existed in the agent to borrow money but where the corporation received the use and benefit of the money it will be liable; (4) by holding an agent out to the public as possessing authority to exercise the powers assumed by the agent and to do the acts performed by him, in which case the corporation would be bound to the extent of the agent's apparent authority.

Our first inquiry, then, relates to the correctness of the ruling of the trial court in holding that there was no evidence tending to show that Dr. Shepherd, treasurer and

"business agent" or "business manager" of the corpora-
tion, had ever been given any authority by the trustees to
borrow money and execute the notes of the corporation
therefor.  This necessitates an examination of the testi-
mony to some extent.

The mere appointment of Dr. Shepherd as treasurer,
or his appointment (if he was so appointed) as "business
agent" or "business manager," would not have, of itself,
invested him with any authority to borrow money and
give the obligations of the corporation.  If he was given
such authority it must be traced to some other source than
his mere appointment by the trustees to these positions.
Dr. Shepherd was one of the trustees of appellee for some
years prior to his election, April 20, 1897, to the office of
treasurer of the corporation, and he continued thereafter
as one of said trustees.  The minutes of the proceedings
of the board of trustees show that on May 6, 1897, Dr.
Shepherd was directed "to make a careful examination of
the Garrett building in Chicago with a view of making
such alterations as will increase the income from the prop-
erty and to report his recommendations to the board of
trustees, with plans and estimates of the probable expense
of the alterations and recommendations."  We are unable
to find in the abstract any report of Dr. Shepherd made in
pursuance of this authority and direction.  The minutes of
a meeting of the trustees held May 26, 1898, show that
Dr. Shepherd presented a form of lease with Reid, Mur-
doch & Co., with memoranda and specifications; that the
same were approved and "the proper officers of this board
of trustees be authorized and directed to execute the same."
At the same meeting a resolution was adopted "that R. D.
Shepherd, treasurer, be authorized to arrange for a build-
ing loan for the purpose of constructing the building re-
ferred to in the foregoing lease, the amount not to exceed
three hundred thousand ($300,000) dollars, and that, pend-
ing negotiations for such a loan, he be authorized to make

temporary loans as the necessity of the progress of the work may demand." The president and secretary were authorized to execute such building contracts for the construction of the building as they and the treasurer might approve. This building was to be erected upon land owned by appellee and formerly occupied by a building known as the "Garrett building." At a meeting of the trustees of the appellee May 25, 1899, Dr. Shepherd reported that the building was not yet complete and that some of the money due for its construction was being held until the work was approved. Dr. Shepherd also reported that appellee owned real estate with a twenty-foot frontage on Randolph street for which he had been offered $30,000; that he could buy twenty feet adjacent to it for $26,000, and asked the board to determine whether it would sell its property or buy the adjacent property and improve the whole by erecting a building thereon. A motion was made and adopted by the board of trustees that the matter be left to a committee, consisting of William Deering and Dr. Shepherd, with full power to determine what should be done in the matter. As we understand the evidence it was determined to sell this property and it was sold for $30,000. In 1901, on the recommendation of Dr. Shepherd, the board of trustees of appellee ordered the construction of two other buildings upon its property. One of them is called the "Manufacturer's building," the other one the "Factory building." The building constructed on the Garrett building site and leased to Reid, Murdoch & Co. cost $408,573.26. The manufacturer's building cost $353,946.14. The cost of the factory building is not given. We do not find in the abstract the specific orders and directions of the board of trustees authorizing the construction of the factory building. It only appears to have been constructed by authority of the board. Neither is it shown at what time the buildings were completed. At a meeting of the board of trustees May 27, 1903, a resolution was adopted authorizing "the

243—20

proper officers of the board of trustees" to arrange for funding so much of the floating indebtedness of appellee. as may be deemed expedient. On May 25, 1899, Dr. Shepherd made a report to the annual meeting of the board of trustees of the appellee purporting to show receipts and disbursements for the preceding year. In that report he charges himself with having received $22,783.66 and having paid out $28,848.87. The evidence shows that he also made a report of receipts and expenditures May 29, 1901, but this report is not to be found in the abstract or the record. Crandon, secretary of the board, testified, that in that report Dr. Shepherd credited himself with the payment of $12,136.72 interest. We find no other report of receipts and expenditures by him until May 24, 1905, when he made a report purporting to show receipts and disbursements for the two years from 1903 to 1904 and 1904 to 1905. The report shows receipts for the year 1903 to. 1904 of $201,434.81, and expenditure of all of that sum except $7541.53 balance on hand. In his report for the year 1904 to 1905 Dr. Shepherd charges himself with $111,330.67, and credits himself with disbursing all that sum except $17,812.11. He does not charge himself in any of these reports with receipts of moneys borrowed for the construction of the buildings erected, and testified on the trial that the building account was not included in his reports. F. P. Crandon was one of the trustees of appellee and was secretary of the board. He testified that he examined the reports made by Dr. Shepherd for the board and compared the disbursements with the vouchers, but he never examined the books of the treasurer, or anything else than the report, to verify the correctness of the receipts.

It is apparent from the items reported by Dr. Shepherd as making up his receipts and disbursements that moneys received on account of the building operations were not included. It would seem that this must have been known by the board of trustees, for the authorized cost of the con-

struction of the Reid-Murdoch building and the manufac-
turer's building was more than one-half million dollars.
Their actual cost, when completed, was more than three-
quarters of a million dollars. There is no evidence of any
source from which this money could have been obtained
except by the negotiation of loans. That Dr. Shepherd
did, during the progress of the building operations, bor-
row money and give notes of the corporation therefor was
known to the board of trustees. Some of such notes were
paid off by appellee, and the proof tends to show that these
notes were given and paid off with the approval of the
board of trustees. Eight notes, aggregating a large sum of
money, were given to the Illinois Trust and Savings Bank
between August 1, 1898, and November 16, 1898. Three
notes were given to the State Bank of Chicago between
May 4, 1899, and October 1, 1901. One note for $2000
was given to H. F. Fisk, trustee for Mrs. Coan, in 1897.
January 14, 1899, a note for $1400 was given the Woman's
Foreign Missionary Society, and February 3, 1903, a note
for $6000 was given the same organization. August 1,
1900, a note for $1100 was given Jennie P. Fisk, and Sep-
tember 25, 1901, another for $2218 was given the same
party. With the exception of the note to H. F. Fisk, trus-
tee, all these notes were executed after the building opera-
tions had been entered upon. They were all signed by
appellee, by Dr. Shepherd, treasurer. As we have said,
the proof tends to show appellee had knowledge of these
transactions.

It will be observed that when Dr. Shepherd was au-
thorized to negotiate a loan for the construction of the
Reid-Murdoch building he was also authorized to secure
temporary loans pending its negotiation. The evidence
tends to support the conclusion that he exercised this au-
thority and borrowed money upon the notes of the corpo-
ration, from small amounts up to considerable sums, from
time to time. If these temporary loans were ever consoli-

dated in one amount to one person or corporation the record does not show it. The record of the board of trustees authorizing the construction of the manufacturer's building is not as specific in its authority to Dr. Shepherd to borrow money as was the record with reference to the Reid-Murdoch building. With reference to the manufacturer's building, Dr. Shepherd, in a report made to the trustees May 29, 1901, recommended the construction of the building at a cost approximating $300,000, and that authority be given to execute a lease for it, and authority be given, also, "looking toward the procurement of a fund for the purpose of building." A motion was adopted by the trustees "that said report be approved and that its several recommendations be concurred in." It was not necessary that authority might be conferred by the appellee on Dr. Shepherd to borrow money that the evidence of such authority should be reduced to writing and preserved. The failure to preserve in the minutes or other writing the evidence of a corporation's act conferring authority upon its agent to borrow money would not invalidate authority conferred. If there is a writing or record of the authority it is the most satisfactory evidence to establish that fact, but where the evidence is not so preserved, then it may be proven by any legitimate testimony, direct or circumstantial, competent under the rules of evidence to prove a fact not evidenced by any writing or record. (*Bank of United States* v. *Dandridge,* 12 Wheat. 64.) That a record was not always made of the acts of the board of trustees is indicated by the fact that no record was made of any action of the board, so far as this record shows, for the construction of the factory building. It certainly cannot be presumed that such an important and expensive work could be done without the knowledge of the board of trustees, and if it did know of the work and permitted it to go on and money to be borrowed for that purpose, the corporation would be deemed to have ratified the acts of the agent

borrowing the money used for the construction of the building. It is a circumstance also proper to be considered with all the other evidence in determining whether the board of trustees had, in fact, authorized Dr. Shepherd to borrow money.

That the indebtedness incurred by the corporation in its building operations was not all paid off prior to May 27, 1903, by merging all the corporation's indebtedness into one or more loans on long time, is inferable from the fact that on the last mentioned date the board of trustees adopted a resolution authorizing its proper officers "to arrange for funding so much of the floating indebtedness of the institute as it may deem to be expedient." Two of the notes sued on were given before that resolution was adopted and one of them afterwards. In his report of May 24, 1905, which covered a period of two years previous, Dr. Shepherd stated that his work in connection with the negotiation of loans and the development of the corporation's property had made very heavy demands on his time and vitality; that he wished in the near future to ask to be relieved of these cares and duties; that no special statement had been previously made in regard to the various building operations, and not being himself an accountant, he requested that a thorough examination of his accounts be made by Mr. Crandon and presented to the board of trustees at its convenience. Pursuant to this request Crandon was directed to audit the accounts of Dr. Shepherd and authorized to employ such help as he deemed necessary in doing the work. Thereafter Crandon reported, as the result of his investigation, that while Dr. Shepherd was treasurer of appellee, and up to September 30, 1905, he had received $1,786,315.22, and that, including the balance which his accounts showed was on hand, he had disbursed the same amount. Crandon testified, however, that all of this balance was not on hand as a matter of fact and that Dr. Shepherd was $11,000 short in his accounts with

appellee. It is a reasonable inference to be drawn from the proof that the principal part of the large sum of money received by Dr. Shepherd was from loans negotiated by him. In his report for the year 1903 and 1904 Dr. Shepherd credits himself with having paid $35,476.54 interest, and in the report for the year 1904 and 1905 he credits himself with having paid $32,567.91 interest. These reports were not made until after the notes sued on were given, but the authority of Dr. Shepherd to pay these large sums of interest does not appear to have been questioned by the board of trustees. It is a circumstance proper to be considered in connection with the previous acts of the board of trustees proven upon the question whether the board had authorized Dr. Shepherd to borrow money and issue notes. The evidence also tends to show that moneys received by Dr. Shepherd as treasurer of appellee were deposited in the State Bank of Chicago to the credit of appellee and were checked out by him, and no one else had any authority to draw checks against the account.

We might refer to other circumstances in evidence, but in our opinion the foregoing is sufficient to have entitled appellant to have the case submitted to the jury upon the question whether appellee had given Dr. Shepherd, in his capacity as treasurer and "business agent" or "business manager," actual authority to borrow money and give notes therefor, or whether, in the absence of actual previous authority to do so, he had borrowed money and given notes with the full knowledge and approval of the corporation. On a motion to direct a verdict the court is not permitted to weigh the evidence. If there is any evidence which, with all reasonable inferences to be drawn therefrom, fairly tends to prove the plaintiff's case it should be submitted to the jury. *Woodman* v. *Illinois Trust and Savings Bank*, 211 Ill. 578; *Libby, McNeill & Libby* v. *Cook*, 222 id. 206.

We are also of opinion there was sufficient evidence to entitle plaintiff to have the case go to the jury upon the question whether, in the absence of any authority in Dr. Shepherd to borrow the money and give the notes sued on, he did borrow it and appellee received the use and benefit of it. The evidence warranted the conclusion that the money received for the notes sued on was deposited in the bank to the credit of appellee. This, in connection with the other proof as to the manner in which the money was drawn out, tends to show that appellee received the benefit of it. It is, of course, not conclusive of that fact, but, standing alone, tends to support it. This court has held that where a principal actually receives the benefit of money procured by the unauthorized acts of its agent, the principal will be liable in the amount it has received the benefit of. *First Nat. Bank of Las Vegas* v. *Osborne,* 121 Ill. 25; *Fay* v. *Slaughter,* 194 id. 157.

We are inclined to agree with the trial and Appellate Courts that there is not sufficient evidence in this record to go to the jury upon the question whether appellee was liable by reason of having held out Dr. Shepherd to the public as possessing apparent authority to borrow money and issue notes of the corporation. In *Merchants' Nat. Bank* v. *Nichols & Shepard Co.* 223 Ill. 41, it was said, on page 50: "A principal may be bound to the extent of the apparent authority which he has conferred upon his agent, but that is because he has held the agent out to the public as possessing the power which the agent exercises. In such a case the principal may bind himself by causing others to believe the powers of the agent to be greater than those actually conferred, (*Maxey* v. *Heckethorn,* 44 Ill. 437,) but the acts which amount to such representation of the agent's authority must be known to the party setting them up if he intends to avail himself of them. (*Rawson* v. *Curtiss,* 19 Ill. 456.) A party dealing with an agent must prove that the facts giving color to the agency were known

to him when he dealt with the agent. If he has no knowledge of such facts he does not act in reliance upon them and is in no position to claim anything on account of them." To the same effect is *Jackson Paper Manf. Co.* v. *Commercial Nat. Bank,* 199 Ill. 151. Where reliance is placed upon the apparent authority of an agent to bind the principal by giving notes, the assignee of such notes, even though they were received before maturity, would occupy no better position than the payee, for if the payee was not authorized to take the notes he could not confer authority upon his assignee to collect them. We think the evidence does not fairly tend to show that Fisk knew of and relied upon the acts of appellee which it is now claimed invested Dr. Shepherd with apparent authority to borrow the money and give the notes. A case of squandering or appropriating to his own use, by an agent or officer of a corporation, moneys borrowed in the name of the corporation but without reference to its corporate needs and purposes is not presented for decision by this record.

The evidence, we think, was sufficient to justify submitting to the jury the liability of appellee on three grounds: First, whether the money was borrowed by authority, express or implied, of the corporation; second, if not borrowed in pursuance of authority previously given, did the corporation, after knowledge of the fact of its being borrowed, approve or ratify it? Third, if it was borrowed without previous authority, and was not afterwards, with knowledge, ratified by the corporation, did it receive the use and benefit of the money? It will, of course, be understood that we do not intend, by what is said herein, to express any opinion as to the weight of the evidence. What we have held is, that upon certain grounds mentioned the evidence was sufficient to require the case to be submitted to the jury.

The judgments of the Appellate and municipal courts are reversed and the cause remanded.

*Reversed and remanded.*