## RALPH E. LONG ET AL. *v.* BALTIMORE & OHIO RAILROAD COMPANY ET AL.

[No. 16, January Term, 1928.]

266.

*Decided April 20th, 1928.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Milton G. Urner, Jr.,* and *Alban M. Wood,* for the appellants.

*Parsons Newman,* with whom was *J. A. C. Bond* on the brief, for the Baltimore & Ohio Railroad Company, appellee.

*Arthur L. Jackson,* with whom was *Oscar J. Horn* on the brief, for the Grand International Brotherhood of Locomotive Engineers, appellee.

PARKE, J., delivered the opinion of the Court.

The appellants, Ralph E. Long and James S. Poteet, are railway engineers in the service of the appellee the Baltimore and Ohio Railway Company, a corporation, operating its extensive railway system, and members in good standing of the Grand International Brotherhood of Locomotive Engineers, an unincorporated association of more than seven members, the other appellee. The proceedings at bar were begun by the appellants against the appellees by a bill of complaint for an injunction to compel the appellees to recognize and enforce the alleged right of the appellants to employment by the railway company in a special form of railway work at a particular place by virtue of an agreement between the railway company and the brotherhood whereby territorial seniority of employees in point of service with the company was thus rewarded. The preliminary pleadings before the parties were at issue embraced a motion by the brotherhood to quash the writ of summons and return on the ground that the brotherhood was an unincorporated body with its permanent headquarters in Ohio, and so was not within section 104 of article 23 of the Code, since the proceedings were not an action affecting the common property, rights, and liabilities of the brotherhood; and, when this motion was lost, demurrers by each of the appellees to the original and two successively amended bills of complaint; and after the demurrers to the second amended bill were overruled, answers on the part of both appellees. The principal substantive objections raised by the demurrers are: (1) That precedence or preference founded upon seniority of service are not such property rights in the workman as would justify a court of equity intervening by injunction to prevent any change in such precedence or preference by the party or parties creating them. Compare *Burger v. McCarthy,* 84 W. Va. 697; *Hunt v. Dunlap (Texas),* 248 S. W. 760; *Chambers v. Davis,* 128 Miss. 613; *Gregg v. Starks,* 188 Ky. 834. And (2) that the trade agreement between the railway company and the brotherhood is not a contract be-

tween individual members of the brotherhood and the company, which will sustain the present proceedings by individual members. Compare *West v. Balto. & O. R. Co.,* 103 W. Va. 417; *Burnetta v. Coal Co.,* 180 Mo. 241; *Hudson v. Cincinnati etc. R. Co.,* 152 Ky. 711, Ann. Cas. 1915B 98; *Powers v. The Journeymen Bricklayers Union,* 130 Tenn. 643, L. R. A. 1915E 1006; *Jennings v. Lee,* 395 Fed. 561; *Connett v. United Hatters of North America,* 76 N. J. Eq. 202; *Peircy v. Louisville & N. Ry. Co.,* 198 Ky. 477, 33 A. L. R. 322; 16 *R. C. L.,* p. 425, sec. 10; 24 *Cyc.* 824.

These questions on the motion to quash and on the demurrers are important and debatable, but we shall pass them without an expression of opinion, since this is rendered unnecessary by our agreement with the judgment of the chancellor in dismissing the bill of complaint on the proof taken.

The brotherhood is a large and powerful labor union of men employed as locomotive engineers upon the different railways of the United States, Canada and Mexico, and through its constituted officials represents its members collectively, and negotiates with the several railways of the United States, and concludes agreements with them with respect to standards of wages and working conditions and rules and regulations governing the service of the members. Such a treaty had been concluded between the Baltimore and Ohio Railroad Company and the brotherhood in reference to the rates of pay and regulations governing engineers in road and yard service. By this contract the company was bound to give employment to its workmen in accordance with their preferential rights as determined from the rules of the brotherhood. The order in which work was given to railroad employees and in which precedence was accorded them in the assignment to particular jobs was decided by territorial seniority, which, generally speaking, was the relative position of a particular fireman or engineer with respect to his fellows in the same rank of employment and excellence of standing, but of different length of service. To

put it more concretely, the workman who was oldest in years of service as an engineer, other things being equal, should have the preference in the allotment of runs and other work in his yard or on his division. The matter in dispute here is whether or not the appellants have been wrongfully deprived of any preference which they enjoyed in the operation of the company's Brunswick Yards in Frederick County. The answer to this question depends mainly upon the validity of an agreement or resolution of January 25th, 1908, which is known as the "fifty-fifty agreement." In order to comprehend this document and the circumstances of its adoption, it will be necessary to outline the history of the controversy.

In the first place, the unit of the brotherhood organization is the lodge, which it calls a "division." These subordinate lodges or divisions are organized at different points along the various railway systems, and every one of these divisions has territorial jurisdiction over a certain section or portion of the particular railway on which its members are employed, and the seniority rights of the members of every such division are effective or valid only on that portion of the railway on which the members of that division are employed. At this point it should be stated that the term "division" has a threefold use on this record. In railway use it means those territorial sections or geographical units into which a railway system is divided for operative purposes; while in brotherhood terminology its meaning is either a subordinate lodge or, for the purpose of ascertaining precedence through seniority, a particular area or district of the railway. It frequently occurs that a division will be coterminous in both railway and union usage, as is illustrated on this record. Before May 10th, 1891, the Baltimore or First Division for railway purposes extended from Baltimore to Martinsburg, West Virginia, and Division No. 97 of the brotherhood had the twofold significance of the lodge established at Baltimore and the section of railway territory along the company's railroad west to Martinsburg. Likewise, the company's Cumberland or Second Division began at the western terminus of the

First Division in Martinsburg and extended westward; and Division No. 506 of the brotherhood meant the local lodge at Brunswick, and that section of railway territory west of Martinsburg, which was the dividing point between Divisions 1 and 2 of the company and Divisions Nos. 97 and 506 of the brotherhood. So for both railway operation and seniority purposes there was no territorial difference before May 10th, 1891, but on that date the company opened its Brunswick Yard, which then embraced only what is now known as the east yard at Brunswick, and, at the same time, both the company and the brotherhood, respectively, reduced the territorial extent of the Baltimore Division and Division No. 97 by about thirty-five miles, by making their western terminus at the west end of what is now called the "east yard" at Brunswick; and, correspondingly increased the track mileage of the Cumberland Division and Division No. 506 by making it include the railway territory between the west end of the "east yard" at Brunswick to Martinsburg. To compensate for this loss of trackage, a number of engineers of Division No. 97 were transferred to Division No. 506, in both senses of lodge membership and seniority rights, in order that the proportion of engineers allotted by track mileage should approximately remain the same. The dividing line between the division at Brunswick was at a point near Maple Avenue, and from 1906 to 1908 the company built a westward extension of its yards at Brunswick. This addition was as large or larger than the original, and is called the west yard, and was built entirely within the Cumberland Division and Division No. 506. About 1908 the company for operating purposes again changed the western terminus of the Baltimore Division from the point near Maple Avenue in Brunswick to a point at or near Weverton Station, but the brotherhood made no change, so that the engineers of the Cumberland Division still enjoyed their rights of territorial seniority to the western end of the old or east yard. The yard was a unit for railroad operations, and the company began to operate both the old and the new parts as one. Since the seniority rights of the yard engineers were respectively limited to the

territory within their respective divisions, the result was that the portion of the Brunswick yard west of Maple Avenue was subject to the territorial seniority rights of the engineers of Division No. 506 (Cumberland) and that section of the yard east of Maple Avenue was governed by the territorial seniority rights of engineers of Division No. 97 (Baltimore), so that, in order for the company to obey the rule of the brotherhood according to the agreement between them, it was necessary for the engineers working in this yard, and repeatedly passing from one end of the yard to the other, as is required in such railway service, to have their engineers and crews change every time an engine crossed the intangible boundary line between the two brotherhood divisions at Maple Avenue. Such an impossible situation cried out for a solution, particularly as at this time employment on yard engines was considered a preference and advantage over running road engines. Now the matter of prescribing and defining territorial seniority rights was within the exclusive jurisdiction of the brotherhood, which attempted to settle these conflicting territorial seniority rights by a resolution or agreement, which is known as "the fifty-fifty" agreement, is dated January 25th, 1908, and reads thus:

"Resolved that the east and west yards of Brunswick be considered one yard, so far as yard engines are concerned. That the first and second division engineers shall hold equal rights according to their seniority, according to Art. No. 2 of present agreement; but it is understood that no engineer who is in the yard at present shall be moved unless he has been promoted for yard service since 1900. That vacancies be filled in as vacancies occur. W. E. Evans, 506; B. R. Stull, 97; C. H. Burch, 352."

This would seem to be a fair, reasonable and practical adjustment of the conflicting interests involved, and it has since been enforced. However, the argument in this court is that this resolution or agreement was void *ab initio* because it was not passed in accordance with the constitution, statutes, and standing rules of the brotherhood; and that, therefore, no appeal from the adoption of the agreement was necessary

within the limitations for appeal prescribed by the laws of the brotherhood; and, if the agreement were within the rule of limitations, the appellants had begun their appeal within the period allowed.

The evidence was taken before the chancellor, and was directed to the establishment of the equity of the appellant, Ralph E. Long, who seems to be the real appellant, although the appeal is taken in the name of both complainants. No contention is made by the appellants that, if the assailed resolution is valid, they have sustained any wrongs, so the fundamental question is the validity of the resolution.

As has been mentioned, the engineers are members of subordinate lodges called divisions, which are identified by a given number. There are thirty of these divisions on the company's railroad system. As has been shown, the division at Baltimore is No. 97, and its members are entitled almost exclusively to seniority on the Baltimore Division; the division at Brunswick is No. 506, and some of its members have seniority on the Baltimore Division and some on the Cumberland Division, and the division at Martinsburg is No. 352, and almost all of its members have seniority on the Cumberland Division. Hence these three lodges were primarily concerned in the seniority rights on the Brunswick yards.

By the constitution of the brotherhood, its governing body is known as the Grand International Division of the Brotherhood of Locomotive Engineers, which shall have "exclusive jurisdiction over all subjects pertaining to the brotherhood, and its enactments and decisions upon all questions are the supreme law of the brotherood, and all divisions and members of the order shall render true obedience thereto." In pursuance of this authority, this legislative body enacted as one of the standing rules of the brotherhood that "the general committee of adjustment shall have full power to settle all questions of seniority and rights to runs, or jurisdiction of territory that are presented to them legally, and their decision shall be final unless on an appeal to the membership their

decision is repealed by a two-thirds vote of the membership on the system."

On any system of railroad where two or more divisions are organized there shall be a standing general committee of adjustment whose members shall consist of one representative, with one vote, from every division on the railway system, and who shall be elected and meet triennially. This committee may make such rules or regulations as are deemed necessary for the proper adjustment of differences on its system, provided that they do not conflict with the laws of the brotherhood; and the general chairman of the committee constitutes the committee between meetings, and any action by the general chairman or by the committee shall stand as law for all members and divisions on the system until repealed by the general committee or by a two-thirds vote of the members of the system or by the Grand International Division, provided that before an appeal or any question of law shall be entertained on appeal by the Grand International Division the question of law must first have been appealed from the general committee of adjustment to the grand chief engineer.

The general committee of adjustment on the company's system is composed of thirty members and the general chairman, who was W. W. Puckett during 1908 and the whole period of this controversy. At its meeting in 1908, the general committee of adjustment had brought before it the controversy with respect to the Brunswick Yard, and from the minutes of that meeting it appears that the general committee adopted the motion of Daugherty and Clair, two of its members, and determined "that the jurisdiction of Brunswick Yard be referred to Divs. 97, 352 and 506." The reference to "Divs. 97, 352 and 506" meant the members of the committee who represented the respective divisions at Brunswick, Martinsburg and Cumberland, the three divisions whose members were concerned in the controversy. These three representatives were W. E. Evans of Division No. 506 (Cumberland), B. R. Stull of Division No. 97 (Baltimore), and C. H. Burch of Division No. 352 (Martinsburg).

The entry quoted is the only record found on the minutes of the meeting of the general committee of adjustment, but the oral evidence is convincing that the question came before the general committee in a regular way and was acted upon by the general committee as a body. The proceedings were begun by Division No. 506 proposing to present the problem at Brunswick Yard, and notifying Divisions Nos. 97 and 352, the other two divisions whose members were concerned in its settlement, of this intention. In accordance with this action, the representative of Division No. 506 brought the matter before the general committee of adjustment assembled in regular session in Baltimore in January, 1908, and the chairman appointed the representatives from the interested divisions as a committee on the subject. This special committee made one report, which was rejected by the general committee, with instructions in reference to the amendment that would make the proposed settlement acceptable to the general committee; and then the special committee reported their decision to the general committee on January 25th, 1908, in the form set out in this opinion, and the question was then formally put to the general committee, which by vote adopted the report, and then this report was signed by the three members of the special committee, and similarly signed seven copies thereof made for delivery of one of these documents to every one of the three divisions and their representatives on the committee, and to the chairman of the general committee, with the secretary of the general committee remaining one. The parol evidence further tends to show that it was the duty of the representative of the interested division to make a report to his division of the action of the general committee, and that these signed documents were forthwith delivered to every one of the three divisions, and made known to their respective members by being read at one of their subsequent meetings. Furthermore, the agreement went into immediate effect on its adoption, and its operation corrected the existing evil in the company's running of the Brunswick Yard and was open, visible, and notorious, and from that time until the present has continu-

ously governed the allotment of engineers to work on the Brunswick Yard.

Although the period of limitations established by the brotherhood for an appeal from this resolution or agreement has been sixty days for a number of years, yet, at the time of this action by the general committee, the period was fixed at two years. As this resolution was adopted and promulgated and has since been in full force and effect, with respect to the yard service of the members of the three divisions concerned, from the date of the agreement to the beginning of the suit at bar, with no proceedings begun by either a member or a division affected by its enforcement within two years from its becoming effective, it is now too late to challenge its validity on the score of any irregularity in its passage or of a failure of minutes or other record evidence to show what is satisfactorily established on the record by parol proof. A member of a voluntary association must be assumed to know what the laws of its existence declare to be binding upon him, and it is no answer for appellant to say he had no actual knowledge of the agreement here involved until some time in 1919, nor to cite the early infrequency of occasions for its application. *Bauer v. Sampson Lodge,* 102 Ind. 262; *Mut. Fire Ins. Co. v. Miller Lodge,* 58 Md. 463, 471; *Re Fireproof Doors Co.* (1916), 2 Ch. 142; *Alton Mfg. Co. v. Garrett etc. Institute,* 243 Ill. 298; 5 *Wigmore on Evidence,* sec. 2451; 2 *Machen on Corp.,* secs. 1125, 1126.

The appellants earnestly assert that the action of the general committee of adjustment was a nullity because it had no jurisdiction over the subject matter, and ground their position on section 30 of the Standing Rules of the Brotherhood. They admit that section 31 of these rules, enacting that "when a question of jurisdiction of territory and seniority arises between members themselves or two or more divisions that cannot be amicably adjusted by such divisions, said question shall, with all the facts in the premises, be referred to the general committee of adjustment who

shall rule on the matter, and such rulings shall stand as law subject to appeal as per section 24," and section 39 of the rules, declaring that "the general committee of adjustment shall have full power to settle all questions of seniority and rights to runs, or jurisdiction or territory that are presented to them legally, and their decision shall be final unless, on an appeal to the membership, their decision is repealed by a two-thirds vote of the membership on the system," confer jurisdiction over the subject matter, but they invoke section 30 as containing mandatory conditions precedent to the exercise of this jurisdiction. So far as the instant case is affected, section 30 is as follows: "No new business will be entertained by a general committee of adjustment unless sent under the seal of a division, and no resolution that has for its purpose the changing of existing rights to runs as understood by engineers will be entertained by any general committee of adjustment until it has been first submitted to all divisions interested, they to vote by ballot on the question and send their member to the general committee of adjustment instructed how to vote."

There are two conditions relied upon by the appellants under section 30. The first is that no new business will be entertained by a general committee of adjustment unless sent under the seal of a division. The plain object of this clause is to secure verity to new business by the seal of the divison wherein the question arose, and, after a lapse of years the presumption of regularity in official action would ascribe this verification to business which undoubtedly was presented, considered, and disposed of by the general committee of adjustment. Moreover, we quite agree with the learned chancellor, who heard the testimony, in his conclusion that the parol proof had established that this condition had been fully complied with.

The second condition is the requirement that all divisions interested shall have first submitted to them, for the purpose of instructing by ballot their respective members of the general committee of adjustment how to vote, any resolu-

tion which has for its purpose the *changing of existing rights to run as understood by engineers.*

The words italicized plainly form a phrase whose meaning is technical and, therefore, to be sought in the art to which it relates. In its ordinary sense, the language excludes the idea that it concerns the question of the *status* of the engineers with respect to their rights of territorial seniority, but does express the notion that the rights are those connected with existing forms of customary operation of railway locomotives. And this reading of the section accords with the testimony of the experts on brotherhood law and practice who testified on the call of the appellees. The evidence of these officials was explicit, and demonstrated that the portion of section 30 now being considered had no application to the subject matter of the resolution adopted by the general committee, since its application is limited to "existing rights to run as understood by engineers." The meaning of this technical term, reinforced by long usage and an unvarying official construction, was the right of an engineer to the continuance of the subsisting customary routine of his work, whether on the road or in the yard. For illustration, if A was the engineer on the train known as the "Capitol Limited" on the run from Baltimore to Cumberland and came back on the train called No. 8; and B was the engineer on the same route, going upon train No. 7 and returning on the "Capitol Limited," these routine trips of A and B are the "runs" meant, and the "rights" to such runs was their continuation without change. So, if A vacated his run, and it were proposed for his successor to go and return on the "Capitol Limited," and for B to go out on No. 7 and come back on No. 8, this would have to be done by a resolution authorizing the change, which would be a resolution within the purview of section 30, and which could not be entertained by any general committee of adjustment until it had been first submitted to the vote of the members of all divisions interested. And, so, in the yards the continuation of the routine manner of the operation of an engine on

a yard is what is included in the expression "rights to run" within section 30; and, similarly, no action can be taken by the general committee of adjustment to effect any change, unless it be first submitted to and voted upon by the members of the divisions concerned. The experts agree, however, that the resolution of January 25th, 1908, was about an entirely different matter, of which the general committee of adjustment had express jurisdiction under section 31 and 39 of the Standing Rules.

Our conclusion is that the resolution of January 25th, 1908, is valid and in full force and effect, and any appeal from the action of the general committee of adjustment in adopting it is long since barred by limitations. If the appellants, or either of them, had any grievance at any time growing out of the enforcement of this resolution or agreement, the constitution, statutes, and rules of the brotherhood gave the members a right to a hearing by and an appeal to the constituted bodies and officials of the organization, especially designed and provided for those purposes, and prescribed a simple and easy procedure to facilitate the hearing, determination, and redress of every wrong. When the appellant in 1919 was denied the right to displace in the Brunswick Yard an engineer on one of the yard engines of a larger and more remunerative type than the locomotive he was running, on the ground that he was not entitled by reason of seniority to the coveted post because of the "fifty-fifty" agreement of January 25th, 1908, his only redress was a recourse to the ample remedies afforded him under the laws of the brotherhood. As a matter of fact, Long made objection to this action and laid his grievance before his division (1919) and, by correspondence and a visit, before the general chairman of the general committee of adjustment (1920); and ultimately by writing to the grand chief engineer in April, 1922. Notwithstanding certain irregularities in his procedure and the bar of the statute of limitations as prescribed by the laws of the brotherhood, the complaint of the appellant was received and considered and, in every instance, denied on the ground that he had no just cause because of the effect

of the "fifty-fifty" agreement. Finally, Grand Chief Engineer W. S. Stone closed the matter in a letter under date of June 24th, 1922, stating that his office would not interfere in any way with the rulings made by the general committee of adjustment or the general chairman. Nothing further happened until, on May 23rd, 1924, the present preceedings were begun.

The appellant Long had been an engineer since 1898, and James S. Poteet, the other appellant, an engineer since 1918, and both have been for a number of years—Long a great number—members of the brotherhood, and were charged with knowledge of the laws and regulations of the union and they should have governed their course accordingly. *Supra*.

It is not necessary to proceed further, and discuss other questions raised. No wrong, fraud, nor illegal proceedings on the part of the brotherhood or its officers have been shown by this record to have affected any right or remedy of either of the appellants, and so neither had any ground to resort to law or equity for redress, which, if not sought, should have been sought within the order, whose decision is final.

The rule which controls this court was stated in *Donnelly v. Supreme Council*, 106 Md. 425, 430, in these words:

"The proposition that the member is not precluded from suing at law, after he has exhausted his remedies within the order, unless the contract specifically provides that the decisions of the tribunals of the order shall be final, is supported by the decisions of some states, among which are the states of Illinois and Indiana. But the Maryland rule is otherwise. That rule was expressed with clearness and precision by the learned judge who decided the case below to be, that when the tribunals of the order have power to decide a disputed question their jurisdiction is exclusive, whether there is a by-law stating such decision to be final or not, and that the courts cannot be invoked to review their decisions of questions coming properly before them, except in cases of fraud. This is true, whether the member does not press his claim at all before the tribunals of the order, or whether he carries it through the final tribunal, or whether he goes through only a

part of the hearings which he might have in the order. According to the law of this state, it is the existence of a tribunal, properly erected and charged with the duty of determining the rights of the members as between themselves and the order, which is a bar to a suit in court of a member against such order in regard to any question so confided to the tribunals of the members' own choice." *Anacosta Tribe v. Murbach,* 13 Md. 91; *Osceola Tribe v. Schmidt,* 57 Md. 98; *Triesler v. Wilson,* 89 Md. 169; *Weigand v. Fraternities Order,* 97 Md. 443; *Camp No. 6 v. Arrington,* 107 Md. 319; *Worshipful Grand Lodge v. Lee,* 128 Md. 42; *Smith v. Marriott,* 130 Md. 447; *Worshipful Grand Lodge v. Lee,* 131 Md. 681; *Baltimore Lodge v. Grand Lodge,* 134 Md. 355; *Universal Lodge v. Valentine,* 134 Md. 305; *Grand Lodge v. Murphy,* 139 Md. 225; *Grand Lodge v. Klutch,* 144 Md. 491; *Boulden v. Lanahan,* 29 Md. 200, 209, 210.

Upon the grounds assigned, the decree below will be affirmed.

*Decree affirmed, with costs.*