679 A.2d 554 (1996)
342 Md. 663
NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al.
v.
Steven GOLDING et al.
No. 51, Sept. Term 1995.
Court of Appeals of Maryland.
July 26, 1996.
*555 Donald M. Falk (Gary A. Winters, Mayer, Brown & Platt, on brief), Washington, DC (Dennis Courtland Hayes, Gen. Counsel, Baltimore, of counsel), for appellants.
Lisa R. Hodges, P.A., Baltimore (Warren A. Brown, P.A., Baltimore, of counsel), for appellees.
Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.
RAKER, Judge.
The issue we must decide in this case is what role the courts should play in resolving a disagreement between a voluntary membership organization and its members. Specifically, we must determine whether the courts should intervene to interpret provisions of a voluntary organization's membership agreement governing members' eligibility to participate in the election of officers. We shall hold that under the circumstances of this case, the trial court should not have intervened in the organization's internal dispute.

I.
This case involves a dispute between Appellants, the National Association for the Advancement of Colored People ("NAACP") and the Baltimore City Branch of the NAACP ("Baltimore Branch"), and Appellees, members of the Baltimore Branch, regarding the requirements for youth members to be eligible to vote in the Branch election.[1] *556 The NAACP interpreted its rules to preclude youth members from voting in Branch elections unless they paid the full $10 adult membership fee, rather than the $3 youth membership rate. The Circuit Court for Baltimore City granted Appellees' request for an injunction ordering the NAACP to permit $3 youth members to vote in the elections for Branch officers.
The NAACP is a non-profit, voluntary membership corporation, incorporated in New York.[2] The national NAACP organization includes three types of subdivisions: senior branches, college chapters, and youth councils.[3] The Baltimore Branch is an unincorporated voluntary membership association subordinate to the national NAACP. Appellees Steven Golding, Joy Masseaux, and Dawit Habte are youth members of the Baltimore Branch of the NAACP. All have paid the $3 youth membership fee.[4] Appellee Kobi Little is an adult member and a candidate for president of the Baltimore Branch, and has paid the lifetime adult membership fee.
The Constitution of the NAACP establishes the Board of Directors as the governing body of the national organization. NAACP Constitution art. V. The Board has broad supervisory authority over all subunits, including the Baltimore Branch. Id. The Constitution explicitly empowers the Board of Directors to define the purposes of the NAACP and to "establish all major administrative and other policies" governing the affairs of the association. Id. Furthermore, the Constitution authorizes the Board to "create such additional categories of membership and establish such fees as it may deem desirable." Id. art. III, § 2. The Constitution and Bylaws for Branches also deems the Board the final authority in resolving membership disputes and administering discipline. See NAACP Constitution and Bylaws for Branches art. X [hereinafter Branch Constitution].
The Baltimore Branch was scheduled to elect new officers on November 28, 1994. This case arose from a dispute regarding provisions of the Branch Constitution governing youth members' eligibility to vote in the Branch election. The Branch Constitution provides that:
Members in good standing shall be eligible to run for office or vote in a Branch election.... For the purpose of voting in Branch elections ... a member in good standing is one who has been a bona fide member of the Branch at least thirty (30) days prior to the date the election is held.... For all other purposes, a member in good standing is one who has paid the requisite minimum membership fee to the Branch.
Branch Constitution art. V, § 11. In addition, Article V, § 12 of the Branch Constitution states that:
The minimum voting age for any member in good standing in Branch elections shall be 17 years. Where there is an active Youth Council (25 members or more) members 17-20 years of age can vote in the Youth Council or the Branch.

(emphasis added). The past practice of the organization, however, was that youth members who had only paid the $3 membership fee, rather than the $10 adult membership *557 fee, were not eligible to vote in Branch elections.[5]
The possibility of youth membership participation in Branch elections arose only after the second sentence was added to Article V, § 12 by amendment in 1994. Following the Amendment, the NAACP received several inquiries about the significance of the new language. As a result, the organization requested an opinion from counsel, who interpreted the amendment to mean that youth members were eligible to vote, but only if they paid the $10 adult membership fee. The Board of Directors adopted this opinion as its official interpretation of Article V, § 12 at a meeting held on October 13, 1994.
On October 21, 1994 all branch offices of the NAACP, including the Baltimore Branch, were notified of the Board's interpretation in a memorandum. Appellee Little had previously informed Appellees Habte, Masseaux, and Golding, among others, that they would be eligible to vote in the Branch election as $3 youth members. On learning of the Board's contrary interpretation, on November 10, 1994, Little wrote a letter to the NAACP Interim Administrator in Baltimore, Maryland and to the National Office of the NAACP requesting that the Board's decision on youth votes be rescinded. In response, Mr. Little received a phone call from a representative of the national organization indicating that the decision would not be reversed. Colonel William Penn, Director of Branches and Field Services for the NAACP, subsequently contacted Little to attempt to set up a meeting to resolve the dispute.
Without exhausting the available internal remedies,[6] on November 25, 1994, the Appellees filed a complaint for breach of contract in the Circuit Court for Baltimore City, seeking an ex parte and permanent injunction to delay the election. The Circuit Court granted an injunction, suspending the Branch election for ten days.
The Circuit Court held a hearing on the merits on December 5, 1994. At the hearing, Appellants argued that injunctive relief was an inappropriate remedy because there was no potential for irreparable harm to Appellees. The trial court rejected this argument, concluding that there was "a real chance of irreparable harm" because there was no adequate remedy afforded by the NAACP Constitution for preelection complaints. Furthermore, delaying complaints until after the election would not preserve any temporal political advantage.[7] The court also noted that the post-election grievance process could not be initiated unless a minimum number of petitions were filed. See Branch Constitution art. 5, § 15. Therefore, a single member, such as Mr. Little, would be barred from filing an individual post-election complaint. Finally, the court concluded that the NAACP Constitution did not designate a person to consider post-election complaints, and that *558 "due process [cannot] depend upon who happens to be in a particular office at a given time." Thus, the Circuit Court enjoined Appellants to hold an election for officers of the Branch no later than February, 1995, and to permit the $3 youth members to vote in the February election.
Appellants noted a timely appeal to the Court of Special Appeals. The Circuit Court granted a stay of the injunction pending disposition of the appeal. Prior to review by the intermediate appellate court, this Court granted certiorari on our own motion to determine:
1. Whether members of the NAACP and its Baltimore Branchvoluntary private organizationsmay invoke the equitable powers of the Maryland courts to regulate the election of Branch officers, without first pursuing the exclusive administrative remedies set forth in the Constitution and Bylaws for Branches of the NAACP?
2. Whether Maryland courts are entitled to review the judgment of the national Board of Directors of the NAACP that, under the Branch Constitution and consistent past practice, persons aged 17 to 20 who purchase only a $3 youth membership in the NAACP (rather than a $10 basic adult membership) are not eligible to vote in Branch elections?

II.
Appellants argue that the Circuit Court should not have intervened in the internal affairs of the NAACP or the Baltimore Branch. First, Appellants contend that the Circuit Court abused its discretion by choosing not to defer to the Board's interpretation of its Constitution. Appellants argue that courts should not intervene in the affairs of a non-profit voluntary association unless civil or property rights are at stake. Appellants contend that since there are no such rights at issue, the trial court erred when it exercised jurisdiction over the case. Appellants also contend that even if the Circuit Court possessed discretion to intervene in such a dispute, the court abused its discretion by intervening on behalf of Appellees who failed to first exhaust their internal remedies.
Appellees argue that the Circuit Court properly intervened in the dispute. While Appellees do not assert that civil or property rights are at stake, they argue that this case should be governed by Maryland corporations law. Specifically, Appellees argue that the members of a non-profit corporation should be treated similarly to shareholders in a stock corporation. Appellees contend that the Board's interpretation of Article V, § 12 of the Constitution was a de facto constitutional amendment, and therefore under Maryland corporations law, branch members were entitled to notice and an opportunity to be heard prior to amendment. Appellees argue that since local members were not given notice, "the action by the NAACP National branch was arbitrary and capricious," and therefore subject to judicial review. (Appellees' Brief at 7). Appellees also contend that the denial of their voting rights constituted a breach of the membership contract and an ultra vires act by the corporation. Finally, Appellees maintain that they exhausted their administrative remedies when Little obtained a negative response to his letter requesting preelection intervention.

III.

A.
We note at the outset that as a general rule, courts will not interfere in the internal affairs of a voluntary membership organization. See Donnelly v. Supreme Council, 106 Md. 425, 430, 67 A. 276, 278 (1907); Anacosta Tribe v. Murbach, 13 Md. 91, 94-95 (1859); Black v. Fox Hills, 90 Md.App. 75, 81, 599 A.2d 1228, 1231 (1992) (quoting Martin v. United Slate Etc. Ass'n, 196 Md. 428, 441, 77 A.2d 136, 141 (1950)), cert. denied, 326 Md. 177, 604 A.2d 444 (1992). See also NAACP of Houston Metro. Council v. NAACP, 460 F.Supp. 583, 589-91 (S.D.Tex. 1978) (trial court should not have intervened in internal management problems of private civil rights corporation [NAACP]). Although similar principles have been applied to both incorporated and unincorporated associations, the rationale for non-intervention differs depending on whether the organization is a Maryland corporation, a foreign corporation, or an unincorporated entity.
*559 If the voluntary membership organization is incorporated in Maryland, the business judgment rule applies to decisions regarding the corporation's management. See Maryland Code (1975, 1993 Repl.Vol., 1995 Cum.Supp.) Article 2, § 405.1 of the Corporations and Associations Article (codifying the standard of care required of directors of a corporation). See also Parish v. Maryland & Virginia Milk Producers Assn., 250 Md. 24, 75-76, 242 A.2d 512, 540 (1968), cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); Black, 90 Md.App. at 81-83, 599 A.2d at 1231; J. HANKS, JR., MARYLAND CORPORATION LAW § 6.8, at 174-77 (1990 & 1996 Supp.). The business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith. Black, 90 Md.App. at 82, 599 A.2d at 1231; see also HANKS, supra, at 175. The rationale for the business judgment rule is that:
[a]lthough directors of a corporation have a fiduciary relationship to the shareholders, they are not expected to be incapable of error. All that is required is that persons in such positions act reasonably and in good faith in carrying out their duties.... Courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence.
Black, 90 Md.App. at 82, 599 A.2d at 1231 (quoting Papalexiou v. Tower West Condominium, 167 N.J.Super. 516, 401 A.2d 280, 285-86 (1979)).
With regard to foreign corporations, Maryland courts have traditionally declined to interfere in management disputes under the "internal affairs doctrine." See, e.g., Berger v. Bata Shoe Co., Inc., 197 Md. 8, 78 A.2d 186 (1950); O'Hara v. Frenkil, 155 Md. 189, 141 A. 528 (1928); Condon v. Mutual Reserve Fund Life Assn, 89 Md. 99, 42 A. 944 (1899); North State Copper & Gold Min. Co. v. Field, 64 Md. 151, 20 A. 1039 (1885); Wilkins v. Thorne, 60 Md. 253 (1883). As described by the Supreme Court in Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982):
[t]he internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholdersbecause otherwise a corporation could be faced with conflicting demands. 457 U.S. at 645, 102 S.Ct. at 2642. We further explained the rationale for the doctrine in Condon v. Mutual Reserve Fund Life Assn, 89 Md. 99, 42 A. 944 (1899), stating that:
Our courts ... can enforce no forfeiture of charter for violation of law, or removal of officers for misconduct; nor can they exercise authority over the corporate functions, the by-laws, nor the relations between the corporation and its members, arising out of, and depending upon, the law of its creation. These powers belong only to the State which created the corporation.
Id. at 116-17, 42 A. at 948. Accord Moore v. NAACP, 425 Pa. 204, 229 A.2d 477, 478-79 (1967) (upholding trial court's decision that it did not have jurisdiction over internal affairs of the NAACP, a New York corporation, and thus could not enjoin the NAACP from establishing additional chapters in Philadelphia). Thus, ordinarily, we shall not intervene in the internal affairs of a foreign corporation.

B.
Courts have similarly assumed a limited role in resolving the internal disputes of unincorporated associations. In a seminal article in the Harvard Law Review, Professor Chafee outlined the analytic approaches courts had applied to disputes involving voluntary non-profit organizations. Z. Chafee, The Internal Affairs of Associations Not for Profit, 43 HARV. L. REV. 993 (1930).[8] Courts and commentators have advocated a variety of theories to determine when the courts *560 should intervene in the affairs of an unincorporated private organization. A number of courts, for example, have espoused the principle that courts may intervene in the affairs of a private organization only where property rights or a pecuniary interest is at stake. See, e.g., Van Daele v. Vinci, 51 Ill.2d 389, 282 N.E.2d 728, 731 (1972), cert. denied sub nom Certified Groceries of Illinois, Inc. v. Sparkle Food Ctr., 409 U.S. 1007, 93 S.Ct. 438, 34 L.Ed.2d 300 (1972); Hawkins v. Obremski, 33 Misc.2d 1009, 227 N.Y.S.2d 307, 308 (Super. Ct., Queens County 1962). Some courts have modified the pecuniary interest test, elevating the standard to require a showing of "economic necessity" to warrant judicial intervention. See, e.g., National Ass'n Sporting Goods Wholesalers v. F.T.L. Marketing Corp., 779 F.2d 1281, 1285 (7th Cir.1985); Jacobson v. New York Racing Ass'n, 33 N.Y.2d 144, 350 N.Y.S.2d 639, 642-43, 305 N.E.2d 765, 768 (1973); Van Daele, 51 Ill.2d 389, 282 N.E.2d at 731. Cf. Grempler v. Multiple List. Bureau, 258 Md. 419, 426, 266 A.2d 1, 6 (1970). Still others have crafted a broader exception to the general rule of non-intervention, authorizing courts to resolve disputes where either property rights or civil rights are at stake. See State ex rel. Givens v. Superior Court, 233 Ind. 235, 117 N.E.2d 553, 556 (1954); United Bhd. Carpenters v. Carpenters Local Union No. 14, 178 S.W.2d 558, 559 (Tex.Ct.Civ.App. 1944); Loigman v. Trombadore, 228 N.J.Super. 437, 550 A.2d 154, 161 (1988).[9]
Although early decisions focused on whether any property interest was at stake in determining whether or not a court should intervene, a number of courts now have supplanted the pecuniary interest test with other approaches. See Developments in the Law: Judicial Control of Actions of Private Associations, 76 HARV. L. REV. 983, 1001-05 (1963) [hereinafter Developments]; see also Berrien v. Pollitzer, 165 F.2d 21, 22-23 (D.C.Cir.1947). For example, some jurisdictions have applied contractual principles to resolve disputes regarding interpretation of membership agreements. See Combs v. Texas State Tchrs. Ass'n, 533 S.W.2d 911, 913 (Tex.Ct.Civ.App.1976).[10] Others have extended application of the business judgment rule from corporations to unincorporated organizations. Cf. Papalexiou v. Tower West Condominium, 167 N.J.Super. 516, 401 A.2d 280, 285-86 (1979) (applying business judgment rule to decision of condominium association's board). Still others, borrowing principles from trust law, have suggested that the unincorporated organization owes a fiduciary duty to its members. See Falcone v. Middlesex County Medical Soc'y, 34 N.J. 582, 170 A.2d 791, 799 (1961); see also Developments, supra, at 1002-04. Finally, other courts have adopted Professor Chafee's recommendation, implementing a balancing test derived from tort principles to weigh the seriousness of the injury to the individual against the association's interest in autonomy and freedom from judicial oversight.[11]See California *561 Dental Ass'n v. American Dental Ass'n, 23 Cal.3d 346, 152 Cal.Rptr. 546, 551-52, 590 P.2d 401, 406 (1979) (provided the organization's action does not contravene its bylaws, court will only intervene if "the burden on the courts and on the interest of the [organization]... in its autonomy do not outweigh the [member's] interests").
In determining whether courts should intervene in the disputes of voluntary membership organizations, Maryland has traditionally applied a narrow rule. Donnelly, 106 Md. at 430, 67 A. at 278. As we stated in Donnelly:
The proposition that the member is not precluded from suing at law, after he has exhausted his remedies within the order, unless the contract specifically provides that the decisions of the tribunals of the order shall be final, is supported by the decisions of some States ... But the Maryland rule is otherwise. That rule ... [is] that when the tribunals of the order have power to decide a disputed question, their jurisdiction is exclusive, whether there is a bylaw stating such decision to be final, or not, and that the Courts cannot be invoked to review their decisions of questions coming properly before them, except in cases of fraud.
Id. at 430, 67 A. at 278. See also Walsh v. CWA, Local 2336, 259 Md. 608, 612, 271 A.2d 148, 150 (1970); Martin v. United Slate Etc. Ass'n, 196 Md. 428, 441, 77 A.2d 136, 141 (1950); Long v. Baltimore & O.R.R. Co., 155 Md. 265, 279, 141 A. 504, 509 (1928); Supreme Lodge v. Simering, 88 Md. 276, 291, 40 A. 723, 726 (1896); Anacosta Tribe, 13 Md. at 94-95. In this context, we have interpreted "fraud" to include "action unsupported by facts or otherwise arbitrary." Martin, 196 Md. at 441, 77 A.2d at 141.
Our rule limiting courts' intervention in the internal disputes of unincorporated organizations absent fraud is in essence analogous to the business judgment rule applicable to incorporated organizations. See Parish, 250 Md. at 75-76, 242 A.2d at 540. As in the case of corporations, decisions of the unincorporated organization are insulated from judicial review absent fraud, irregularity, or arbitrary action. This approach is also similar to the scope of review for arbitration decisions under Maryland common law. In Board of Education v. Prince George's County Educators' Ass'n, 309 Md. 85, 105, 522 A.2d 931, 941 (1987), we held that an arbitration award is only subject to review for a "`palpable mistake of law or fact ... apparent on the face of the award' or for a `mistake so gross as to work manifest injustice.'" Judge Eldridge, writing for the Court, further explained that:
Like many other general principles ... the rule that arbitration awards will not be vacated for errors of law or fact has several exceptions. Thus an award will be vacated for fraud or for misconduct, bias, prejudice, corruption or lack of good faith on the part of the arbitrator.... A court will vacate an arbitration award if it is not within the scope of the issues submitted to arbitration ... [or if] the arbitrator failed to consider all matters submitted.... And a court will determine whether the parties had a procedurally fair hearing leading to the award.... The Court has also stated that an arbitration award will be set aside for a `mistake of law or fact... appearing on its face.'
Id. at 100-01, 522 A.2d at 938-39 (citations omitted).
While we ordinarily refrain from reviewing decisions of unincorporated private associations, we note that if an organization acts inconsistently with its own rules, its action may be sufficiently arbitrary to invite judicial review. See Developments, supra, at 1020-23. In addition, as our prior cases have illustrated, the policy of minimizing judicial involvement in private organizations does not mean that members have no guarantee of procedural fairness. We have historically taken the view that members in a private organization are entitled to at least rudimentary procedural protections, such as notice and an opportunity to be heard, before they may be expelled or deprived of other important membership rights. See Evans v. Brown, 134 Md. 519, 521-22, 107 A. 535, 536 (1919); Smith v. Merriott, 130 Md. 447, 451, 100 A. 731, 733 (1917). If the organization's adjudicatory procedure does not afford the member these minimal protections, or if the *562 organization provides no avenue for internal review or appeal, then judicial intervention may be appropriate. See Grand Lodge v. Murphy, 139 Md. 225, 233, 114 A. 876, 879-80 (1921).
Furthermore, we have acknowledged the need for increased judicial oversight in one instance, i.e., where the private organization has assumed a position of "real economic power" akin to monopoly status. Grempler, 258 Md. at 426, 266 A.2d at 6. Accord Falcone v. Middlesex County Medical Soc'y, 34 N.J. 582, 170 A.2d 791, 799 (1961). Where no economic interest is at stake, however, we shall not ordinarily review the decisions of a voluntary private organization absent fraud, arbitrary action, bad faith, or other wrongful conduct.[12]

IV.
Even when a dispute between an organization and its members is of a character that warrants judicial intervention, courts have typically required exhaustion of internal remedies as a prerequisite to judicial involvement. In our prior decisions, we have consistently required exhaustion whether or not the bylaws of the organization independently require exhaustion. See, e.g., Long v. Baltimore & O.R.R. Co., 155 Md. 265, 279-80, 141 A. 504, 509 (1928). For example, courts have frequently intervened in disputes within labor unions, because of the pecuniary impact of union membership. Nevertheless, courts have typically required that the aggrieved union member exhaust the remedies open to that member under the union rules before permitting the member to seek aid from the courts. See, e.g., International Bhd. Elec. Workers v. Smith, 76 Ohio App.3d 652, 602 N.E.2d 782, 788 (1992).
We applied the exhaustion doctrine in Walsh v. CWA, Local 2336, 259 Md. 608, 612, 271 A.2d 148, 150 (1970). In Walsh, we declined to intervene in a dispute regarding the union's decision to fine a member for continuing to work during a strike. The union notified the member of its intent to conduct a hearing on the offense, and invited him to bring counsel, present witnesses, and introduce other documentary evidence. The notice also informed the member that if he did not attend, he would be sentenced in absentia. The member did not attend the hearing, and the trial board imposed a fine. The member declined to pursue available avenues of internal appeal prior to bringing suit. Id. at 610, 271 A.2d at 149. As Chief Judge Hammond wrote for the Court,
Maryland law has long recognized the rule that a union member must exhaust the remedies open to him under the union rules before he can seek aid from the courts unless the union procedure is procedurally or substantively inadequate, fraudulent or otherwise arbitrary and illegal.
Id. at 612, 271 A.2d at 150.
The exhaustion principles articulated in Walsh have been applied not only to internal disputes involving labor unions, but also to other disputes involving voluntary organizations. See Smith v. Merriott, 130 Md. at 453, 100 A. at 733. Thus, if a member fails to exhaust internal remedies prior to bringing suit, even if the dispute would otherwise warrant judicial review, we shall not intervene unless the internal remedies are clearly inadequate or if internal appeal would prove futile. See Parish, 250 Md. at 82, 242 A.2d at 545; see also Developments, supra, at 1072-73; Chafee, supra, at 1019-20.

V.
Applying these principles to the facts of the instant case, we first observe that the national NAACP is a foreign corporation. *563 As such, applying the internal affairs doctrine, we decline to interfere with its internal management decisions. Moreover, even under Maryland corporations law, applying the business judgment rule, we would not interfere with the organization's decision because the NAACP did not engage in any fraud, arbitrariness, or bad faith.
Appellees maintain that the Board's interpretation of the eligibility requirement for youth members in essence amounted to a constitutional amendment. If so, the Board's actions could be construed as a procedural irregularity, or an arbitrary action inconsistent with its own rules, because the Board did not follow the procedural requirements for amending the constitution. We do not agree, however, that the Board's interpretation of Article V, § 12 of the Branch Constitution required a constitutional amendment.
The disputed language in Article 5, § 12 is ambiguous because although it permits youth members to vote in Branch elections, it does not specify the required membership fee.[13] To resolve this ambiguity, the NAACP consulted legal counsel, and adopted an interpretation that was consistent with past practice. The NAACP Constitution confers broad authority on the Board to create and interpret the organization's rules and to regulate membership. The organization's interpretation was not arbitrary, and therefore is entitled to deference.
We apply similar principles limiting judicial intervention, as discussed in Section III.B, supra, to unincorporated associations such as the Baltimore Branch. We note first that Appellees do not allege any pecuniary interest is at stake in this controversy. Instead, they advocate judicial intervention because of the historical and political importance of the organization. Appellees' brief at 10-11. Appellees do not propose, however, that we expand the bases for judicial review of unincorporated voluntary organizations' decisions to encompass decisions affecting civil rights. Instead, Appellees posit that the unique importance of the NAACP warrants treating the Baltimore Branch as a corporation would be treated. Failing to treat the Branch as a corporation would be treated, they argue, would suggest judicial paternalism.
Contrary to Appellees' argument, we conclude that applying principles of corporation law, such as the business judgment rule, to the Baltimore Branch does not support judicial review of the Branch's actions. Appellees do not argue that any decision of the Branch was tainted by fraud, irregularity, or arbitrary action; the Branch merely adhered to the interpretation of Article V, § 12 promulgated by the national NAACP. Thus, there is no basis for judicial review. Furthermore, as we stated in Anacosta Tribe v. Murbach, 13 Md. at 95, "It would very much impair the usefulness of such institutions, if they are to be harassed by petty suits of this kind." Accordingly, we reject Appellees' arguments, because we believe the very importance and effectiveness of the NAACP merit significant judicial deference to its internal management.[14] Moreover, the NAACP's internal procedures for challenging elections provided members sufficient procedural protections to ensure fairness in the Branch election.
Finally, even if we considered this dispute appropriate for judicial review, we would decline to intervene in this case because the Appellees failed to exhaust their internal remedies. The Branch Constitution provided a number of mechanisms for challenging elections. Although not all of these *564 options could be exercised in advance of the election, Appellees had the option of casting challenged ballots at the time of the election to preserve their votes pending subsequent internal review. While Appellees contend that the Branch would not have permitted them to cast challenged ballots, the record does not support this. The NAACP Manual on Branch Election Procedure states that: "If an individual wishes to vote but his/her name is not on the official roster being used during the election, and the member presents a membership card, he/she will be issued a `Challenged Ballot.'" None of the Appellees attempted to cast a challenged ballot. In addition, only Appellee Little took any action to alert the organization to the dispute prior to the election. Finally, the Branch Constitution provided ample opportunities for internal post-election review, and Appellees' presented no evidence that this review would be futile.[15]
For the foregoing reasons, we shall reverse the trial court's decision and remand the case for further proceedings consistent with this opinion.
JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.
NOTES
[1] People between the ages of 17 and 20 years old may join the NAACP as youth members. In addition to adult membership and youth membership, the NAACP also provides other special membership categories, i.e., life membership, but the other categories are not at issue in this case. NAACP Constitution and Bylaws for Branches art. VII, § 2 [hereinafter Branch Constitution].
[2] The purposes of the NAACP, as stated in its Constitution, are:

... to insure the political, educational, social and economic equality of minority group citizens; to achieve equality of rights and eliminate race prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state and local laws securing civil rights; to inform the public of the adverse effects of racial discrimination and to seek its elimination; to educate persons as to their constitutional rights and to take all lawful action to secure the exercise thereof, and to take any other lawful action in furtherance of these objectives[.]
NAACP Constitution art. II.
[3] When a Branch recruits a youth member, the membership is automatically transferred to the local Youth Council, if one exists.
[4] Appellee Masseaux was a member of a college chapter before joining the Youth Council of the Baltimore Branch. She testified that she paid the additional $3 youth membership fee to join the Baltimore Branch solely to become eligible to vote in the Branch election.
[5] Testimony before the Circuit Court indicated that youth members were eligible, however, to participate in other elections. For example, youth members who had paid only the $3 membership fee were eligible to participate in State Conference elections.
[6] The NAACP provides several mechanisms for challenging an election. Up to three months before the election, members may file complaints with the national office, which has broad authority to intervene in the election process to protect members' rights. Branch Constitution art. V, § 16. At the time of the election, if there is a dispute regarding voting eligibility, any member with a membership card may cast a challenged ballot to preserve his or her vote for post hoc challenges. NAACP Manual on Branch Election Procedures at 10. Finally, up to five days after the election, a member may submit a complaint to the national office, which may intervene to order a new election, if necessary. Id. The Branch Constitution provides that only controversies that affect the results of the election will be considered by the national office.

The Branch Constitution explicitly requires members to exhaust any available internal remedies before pursuing litigation, stating that:
Should an aggrieved member resort to civil litigation without having pursued the remedies within the framework of the Association, such is considered conduct not in accord with the principles, aims and purposes of the National Association for the Advancement of Colored People, meriting suspension, expulsion or other disciplinary actions.
Branch Constitution art. X, § 2.
[7] Appellees' complaint also alleged that Little would be "irreparably damaged by reason of loss of reputation, credibility and standing in the community in which, having recruited more than 300 youths who joined the Defendant Organizations on the basis of his representations, those representations are proved false."
[8] Distinguishing non-profit corporations from for-profit corporations, Professor Chafee observed that members in non-profit corporations "are not shareholders, and so they must establish some other reasons for equitable relief than the remedies of shareholders with respect to the property and business of the ordinary commercial corporation." Chafee, supra, at 997.
[9] Notably, several courts have distinguished between civil rights and political rights, and have declined to intervene in disputes involving the political rights of members in voluntary associations. See, e.g., Givens, 233 Ind. 235, 117 N.E.2d at 555.
[10] A number of Maryland cases have applied contractual principles to disputes involving private organizations. See, e.g., Donnelly v. Supreme Council, 106 Md. 425, 433, 67 A. 276, 279 (1907). See also Walsh v. CWA, Local 2336, 259 Md. 608, 614, 271 A.2d 148, 151 (1970); Martin v. United Slate Etc. Ass'n, 196 Md. 428, 440, 77 A.2d 136, 141 (1950).

For example, in Donnelly, the plaintiff was a member of a benefit society which provided death and disability benefits to its members. 106 Md. at 426, 67 A. at 277. Donnelly contested application of an amendment to the bylaws of the organization, which altered the eligibility requirements to receive disability benefits. Id. at 427-28, 67 A. at 277-78. We concluded that because the bylaw was enacted before the plaintiff became a member, it became"a part of his contract" with the organization. Id. at 433, 67 A. at 279. Therefore, we upheld the trial court's decision not to intervene to resolve the dispute between the member and the organization. Id., 67 A. at 279. See also Loigman v. Trombadore, 228 N.J.Super. 437, 550 A.2d 154, 161 (1988) ("the constitution and by-laws of a voluntary association become a part of the contract entered into by a member who joins the association.").
[11] See Chafee, supra, at 1008. Chafee observes that the property right or pecuniary interest test may, in many cases, serve merely as an unsatisfactory surrogate for the individual rights of the aggrieved member. He notes that "Dean Pound has pointed out that this alleged property interest is largely a fiction, under the guise of which the courts are really protecting interests of personality." Id. at 999.
[12] In addition to the general rule limiting courts' intervention in private organizations' internal disputes, the courts also may be precluded from interpreting organizational rules that involve, e.g., interpretation of religious doctrines. See American Baptists v. Trustees, 335 Md. 564, 576-78, 644 A.2d 1063, 1069-70 (1994) (In declining to interpret validity of "open communion" practice, the Court stated: "It is well settled in this State that the determination of a membership in a church is a question well embedded in the `theological thicket' and one that will not be entertained by the civil courts."), cert. denied, ____ U.S. ____, 115 S.Ct. 902, 130 L.Ed.2d 785 (1995). Professor Chafee similarly describes the difficulties courts may face in interpreting the rules of a private organization as "the Dismal Swamp of obscure rules and doctrines." See Chafee, supra, at 1024.
[13] Because youth memberships received by the Branch are ordinarily transferred to the Youth Council, the youth members ordinarily are not considered members of the Branch. See supra note 3. Thus, the provision may reasonably be interpreted to permit youth members to vote in Branch elections only if they pay the requisite $10 membership fee to become members in good standing of the Branch.
[14] As Professor Chafee observed,

The value of autonomy is a final reason which may incline the courts to leave associations alone. The health of society will usually be promoted if the groups within it which serve the industrial, mental, and spiritual needs of citizens are genuinely alive. Like individuals, they will usually do most for the community if they are free to determine their own lives for the present and the future.
Chafee, supra, at 1027.
[15] Although the trial court noted that Appellees' would have been required to collect a minimum number of signatures, pursuant to Article V, § 15 of the Branch Constitution, in order to initiate a post-election challenge, Appellees' presented no evidence that any effort to collect the necessary signatures would have proven futile. Furthermore, pre-election complaints required no minimum number of signatures. Branch Constitution art. V, § 16.