MARTIN *v.* UNITED SLATE, TILE & COMPOSITION ROOFERS, DAMP AND WATERPROOF WORKERS' ASSOCIATION ET AL.

[No. 28, October Term, 1950.]

*Decided December 6, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Edwin S. Panetti* and *W. LeRoy Ortel* for the appellant.

*Joseph J. Edelman* and *Isidor Roman* for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing, on demurrer, a bill against United Slate, Tile and Composition Roofers, Damp and Waterproof Workers' Association, an International labor union, and Local Union No. 80, filed by plaintiff, individually and as business agent, secretary-treasurer ¡and recording and ¡financial ¡secretary of the Local, (formerly the holder of every office except that of president), to require defendants to re-

instate him to membership in both unions and to the offices in the Local from which he was suspended and expelled, and pay damages sustained by him, to declare the constitution of the International adopted in 1946 null and void, and for other relief as to internal relations or affairs of the International and the Local. If plaintiff was lawfully expelled from office in the Local and membership in both the Local and the International, manifestly he has no standing to ask relief as to any present relations or affairs of either union.

Both unions are unincorporated associations. Local Union No. 80 was organized (plaintiff says, by him) in 1935. A charter was issued to it by International. From 1935 until 1947 plaintiff held the offices mentioned. On March 4, 1947 his salary was $75 per week. A constitution and by-laws of International were adopted in 1919, and amended or new constitutions and by-laws were in force or adopted in 1929 and 1942. At the "Tenth Biennial Convention" of International in 1946 a new constitution and by-laws were adopted—plaintiff says, unlawfully. The convention is the constituent body of International. It is composed of officers of International and delegates from the Locals. The previous constitution in force until October 1, 1946 imposed no limitation on the power of International to amend or adopt a constitution or take any other action by a majority vote at the convention.

The 1946 constitution provided, among other things, that the president, vice-president and secretary-treasurer of International shall constitute its Executive Board (Art. 5, sec. 8) ; the Executive Board "shall have original jurisdiction to try members * * * for all offenses committed against * * * International * * *"; appeals from decisions of the Board shall be taken to the next convention; "the basis for charges against members * * * for which he * * * shall stand trial, shall * * * consist of * * * (4) gross disloyalty or conduct unbecoming a member, (5) if an officer, gross inefficiency which hinders or impairs the interests of the local union or of * * * In-

ternational * * * (11) activities which tend to bring the local unions or * * * International * * * into disrepute" (Art. 9, sec. 5); "decisions and penalties may consist of * * * suspension, expulsion, * * *" (Art. 9, sec. 6); "* * * no interested party shall sit as a member of any trial board; no member or officer shall be tried unless * * * served * * * with a written copy of such charges specifying the matter of the offense of which he be accused; thereupon the accused shall be required to stand trial at the time and place designated, which shall be not less than ten days from the date the charges are served * * *; the accused may appear in person, and with witnesses, to answer the charges. * * * If the charges or any portion thereof are sustained, then the trial board shall render judgment and impose disciplinary action as provided for in this Constitution; * * * upon the filing of such charges, and if the same are of such magnitude and seriousness as to jeopardize the interest of the local union and * * * International * * *, then and in that event the International President may, if he deems it advisable immediately suspend such member or officer until a decision has been reached in the case" (Art. 9, sec. 1); "every accused, against whom charges have been preferred and disciplinary action taken as a result thereof, shall be obliged to exhaust all the remedies provided for herein before resorting to any other court or tribunal". (Art. 9, sec. 8).

On February 12, 1947 the property owned by Local No. 80 was raided by the Baltimore police, and plaintiff and others were arrested for violating the laws against bookmaking, with attendant newspaper publicity, e. g., a heading "Six Arrested In Raid On Union Hall", referring to plaintiff as "business representative" of Local No. 80. Local No. 80 had its office on the first floor of the building. The second floor, where the bookmaking was conducted, was rented to a tenant. Plaintiff was indicted for violating the gambling laws and for assaulting Captain Emerson, who was in charge of the raid. On March 3, 1947 the accused were tried in the Criminal

Court, and plaintiff was found guilty of permitting book-making on the premises and fined $50. The bill alleges that on March 4, 1947 the president of International, Charles D. Aquadro, "and the greater majority of the International Executive Board conducted themselves in such a manner as to be non-conducive to the best interests of Local No. 80, its members and specifically to [plaintiff], and furthermore watched and waited for the opportunity to present itself, whereby they could pounce upon [plaintiff] on the pretext of some small apparent infraction of the International rules", and that the opportunity came when they were informed of the raid.

On February 20, 1947, an International vice-president, Edward F. Hurley, was assigned by the president, Aquadro, to make an investigation in Baltimore. On March 3, 1947 Hurley made a report and charges to International. The charges preferred by Hurley against plaintiff were for violations of the above quoted provisions of Article 9, section 5(4), (5), and (11). The Hurley report narrated the arrest and publicity (stating that plaintiff "thus brought * * * International * * * into disrepute and disgrace") and the subsequent events, stating that plaintiff had been arrested and indicted "for operating a bookmaking establishment" and for assaulting and striking Captain Emerson and "was found guilty as charged", and also stated that Local No. 80 was "in effect a one-man union, wholly operated by plaintiff, and the officers thereof do not carry on their proper functions as officers of the union, but are the pawns of" plaintiff. Hurley recommended "immediate and summary suspension" of plaintiff. On the same day the president authorized Hurley "to take over supervision" of Local No. 80. On March 4, 1947 the president telegraphed plaintiff, stating that charges had been filed against plaintiff, that "in view of the magnitude and seriousness of the charges" he was "of the opinion that they jeopardize the interest" of the local and International, and he therefore deemed it advisable to suspend plaintiff until a decision has been rendered in the case,

and that he had instructed Hurley "to take over and supervise the affairs of Local Union No. 80", and directing plaintiff to turn over to Hurley all the funds of the Local and documents relating to it.

On the same day Hurley demanded supervision, plaintiff refused, and International filed in the lower court a bill for injunction to prevent plaintiff from interfering with supervision and direction of the Local by International. An injunction was immediately granted upon the filing of a bond. On appeal from a refusal to dissolve this injunction, the order was reversed for failure to make the local a party, and the case was remanded with an opportunity to International to amend its bill so as to bring in the local union. *Martin v. United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Association,* 189 Md. 383, 388, 56 A. 2d 28, decided December 11, 1947. On remand International on January 20, 1948 filed such an amended bill, and a similar injunction was granted immediately. Plaintiff answered the amended bill on December 8, 1948. That case had not been set for hearing when the bill in the instant case was filed on March 29, 1949.

A copy of the charges was sent to plaintiff by registered mail on March 4, 1947. In the bill filed the same day by International against plaintiff the Hurley report and the charges were set out in full. As Judge Warnken remarks, plaintiff asked for no further particulars. On March 21, 1947 he was advised by registered letter that the International Executive Board would meet the week of July 28th, and the place of the hearing had been fixed, and he was asked to advise which day of four specified was most suitable to him; the letter further spoke of the method for presenting written evidence and briefs in the event he did not desire to be present in person at the hearing. No definite response having been received as to which date he preferred, he was on June 24, 1947 notified by mail that the hearing had been set for August 1, 1947 in the International offices at Chicago. On the day set neither plaintiff nor anyone representing him

appeared, and he presented no written evidence or statements in his defense. The Board held that the president was justified in suspending plaintiff from office and that the charges had been amply sustained, and decided that plaintiff should "stand expelled" from the Local and International, but that no Local or member thereof should refuse to work "with or alongside of" plaintiff because of the fact that he is not a member. On August 27, 1947 a copy of the decision of the Board was sent by mail to plaintiff. On September 25, 1947 he by letter appealed his case to the convention to be held in September, 1948. He did not attend the convention. The convention ratified his expulsion.

At the hearing or "trial" before the Board the president, the secretary-treasurer and vice-president Hurley "were disqualified from sitting * * * because of their interest in the case as witnesses". Another vice-president "asked to be excused from participating in the case because of his knowledge of the facts". Seven other vice-presidents constituted the Board which heard and decided the case. The evidence before the Board is not before us; the decision is, as an exhibit with the bill. In the decision the Board said, "We regret sincerely that he [plaintiff] did not see fit to be present, or to present written testimony on his behalf. * * * We do not take our task lightly, and we hesitate to use the power granted to us under the Constitution and By-laws of your organization. Such powers should be exercised only under the clearest circumstances. The evidence presented is of such a nature. It is damning, and we would have preferred to hear Martin's explanations before coming to this decision. The evidence consists of many items, * * *". The Board discussed the evidence as to the facts stated in the *Hurley* report and also, concisely but with particularity, certain borrowings of money by the local from an employer, with whom it should "deal at arm's length", and several misappropriations of sums ranging from $15 to $1400, which apparently amounted to embezzlement. Regarding the borrowings the Board said,

"The implications so far as the Union is concerned are as serious as anything Joseph Martin did." Though these pecuniary transactions might have been made the basis of separate charges, they are each pertinent to the original charges. If plaintiff was surprised at any of the facts stated in the decision, he did not say so and has not specifically denied any of them.

The bill covers 24 printed pages, exclusive of voluminous exhibits, none of which has been printed in full, most of them not at all, in this court. It is meager in facts, but abounds in rhetorical denunciation of International's officers and their acts. The 1946 constitution and by-laws "are illegal, null and void", were "illegally and fraudulently adopted at a convention of * * * International * * * held * * * on September 16, 1946, amended September 16, 1946, to September 20, 1946, * * * effective * * * October 1, 1946"; "and were obtained by fraud and by a fraudulent scheme and plan practiced upon [plaintiff] as an officer and member of the local union, practiced upon the local union, its individual members and all of the local unions and their individual members throughout the United States". Much of the bill (including an incorrect statement of what was decided in *United States Tile and Composition Roofers, Damp and Water-Proof Workers Ass'n v. United Brotherhood of Carpenters and Joiners*, 185 Md. 32, 42 A. 2d 913) relates to inter-union and intra-union controversies which are not pertinent (though asserted to be) to any question now properly before us, and regarding which "charges were hurled back and forth between [plaintiff] and * * * Aquadro for a number of years"; "this turmoil was existing between * * * 1942 and 1944", and International's Board "passed [*i. e.*, proposed] new rules and regulations which came to be known as the 'gestapo laws' "; these rules [filed as an exhibit, but not printed in this court] "garroted and made impotent all of the local unions and subjected them to illegal dictatorial power", and were "arbitrary, capricious, illegal, and dictatorial and encompassing"; plaintiff successfully "led

the fight" against their adoption at the 1944 convention. By the election by the 1944 convention of a committee of three to draft and submit to the 1946 convention a new constitution, Aquadro and "the majority of" the International Board "now had its opportunity to work out its fraudulent scheme and plan"; "between the convention of 1944 and that of 1946 charges were hurled back and forth between [plaintiff] and * * * Aquadro"; "the procedure of the 1946 convention was illegal and fraudulent, some acts being that parliamentary procedure was eliminated as governing the procedure of the convention and in its place political maneuvering ran amuck"; "these proceedings showed an utter disregard for the rights of the minority and shrewd and crafty dictatorial powers, in that among other things, the new Constitution and By-laws were passed and adopted over protest, at the beginning of the convention and upon the express promise by * * * Aquadro, the president * * *, that the resolutions presented by many delegates and many local Unions against the adoption of the * * * Constitution and By-Laws would be given a full and impartial hearing, later in the convention proceedings, and when that time arrived this promise was not kept as well as many others, and in that the entire proceedings were so irregular that practically all of the delegates of the Eastern Locals in the United States, before the time for the election of new officers, walked out in utter disgust."

The bill alleges that the Hurley report does not state the real facts "because the raid was not on the Union office or headquarters of the Union but only on the second floor apartment which was occupied by a tenant", and because plaintiff was not found "guilty as charged, i. e., bookmaking and assault", but guilty only of permitting bookmaking on the premises; "the only other charge * * * is an illusory one * * * that the Local Union is in effect a one-man union," viz., plaintiff. The hearing on August 1, 1947 was "illegal and arbitrary"; the Board "illegally expelled plaintiff"; "* * * it would have been useless * * * and a mere vain form to have at-

tempted to make a credible defense before either the International Executive Board which had already pre-judged his case or the convention whereby the matter was not heard before the entire convention on the floor but before a special committee picked for the purpose by the * * * president, * * * Aquadro, * * * and besides the expense of transporting not only [plaintiff] but a number of witnesses in his defense, attorneys at law and an innumerable lot of paraphernalia as proof, would have been far beyond" plaintiff's "financial ability".

The torrent of charges of fraud, arbitrary action, illegality and other wrong in the bill does not consist of allegations of fact, and as Judge Warnken points out, is not supported by facts alleged. In pointing this out Judge Warnken has gone farther than we could go, if we would, by examining exhibits or parts of exhibits, especially convention proceedings, which have not been printed in this court. We do not suggest that by not printing more plaintiff has lost anything; merely that he has limited somewhat the pursuit of the insubstantial and the irrelevant.

Plaintiff contends (1) that the 1946 constitution and by-laws were not validly adopted; (2) that his suspension and expulsion were unlawful; and (3) that he is entitled to relief in equity without first exhausting his remedies within the organization.

If the 1946 constitution was not validly adopted, it does not appear that thereby plaintiff was injured or that the provisions of the prior constitution regarding charges and trials were materially different. Those provisions have not been printed. At the argument it was said to be not clear that the Board previously had power, as it had under the 1946 constitution, to designate a place of trial distant from Baltimore. But plaintiff did not ask a trial in or nearer Baltimore, or avail himself of the opportunity to present written evidence and briefs. However, there is nothing to indicate that the 1946 constitution was not validly adopted. It was adopted after long debate, no one was surprised or was "gar-

roted" by denial of an opportunity to be heard. The prior constitution did not require more than a majority vote for any action. The fundamentals of fair play do not require that before adoption of a constitution action be taken on resolutions relating to parts of it. Nor could the president "promise" action on such resolutions after adoption of the constitution. Nevertheless, it appears that after adoption of the constitution and before it became effective it was amended at the same convention. The bill alleges it was "illegally adopted at a convention * * * held on September 16, 1946, amended September 16, 1946 to September 20, 1946, * * * effective * * * October 1, 1946." The constitution of an unincorporated association is only a contract between the members, not necessarily made by unanimous consent. In the absence of other requirements, and subject to vested rights, it may be made, changed, unmade or superseded by a majority vote of the members or its constituent body. The 1946 constitution was validly adopted, and impaired none of plaintiff's vested rights.

Plaintiff was suspended, and later expelled, in strict compliance with the above mentioned provisions of the constitution. He says the suspension, and the provisions authorizing suspension without previous notice and hearing, were unlawful. Judge Warnken held that matters growing out of the suspension are moot, because expulsion ended suspension. Plaintiff, inverting this reasoning, says the expulsion was unlawful, because the suspension was unlawful and prevented him from making a defense to the charges and getting a fair hearing. We cannot agree. The president, who suspended plaintiff, did not sit on the Board which heard plaintiff's case. If he had sat, he no more prejudged plaintiff's case by suspending him than a chancellor prejudges a case by granting an injunction *pendente lite*. The only apparent inability of plaintiff to make a defense was inability to meet the facts. His explanation of the facts stated in the Hurley report, as to violation of the gambling laws and bringing the union into disrepute, amounts

to a full confession; it is a confession and avoidance in which the avoidance is only a quibble. These facts also show his domination of the one-man union. If the other facts found by the Board in its decision, as to borrowings, and misappropriations, were not true, he could have denied them as specifically and concisely as they were stated in the decision.

Plaintiff alleges that the 1948 convention "ratified his expulsion". His allegation, in the next sentence, that "the matter was not heard before the entire convention on the floor but only before a special committee" evidently means only that before the convention acted (by ratifying the expulsion) the appeal had been referred to a committee. Plaintiff could, with at least as much plausibility, have complained if it had not been referred to a committee.

Judge Warnken held that this case was controlled by the rule, stated in *Donnelly v. Supreme Council,* 106 Md. 425, 430, 67 A. 276 and applied many times before and since, that when the tribunals of an organization, incorporated or unincorporated, have power to decide a disputed question their jurisdiction is exclusive, whether there is a by-law stating such decision to be final or not, and that the courts cannot be invoked to review their decisions of questions coming properly before them, except in cases of fraud—which would include action unsupported by facts or otherwise arbitrary. Plaintiff suggests that this rule, heretofore applied by this court principally to fraternal beneficial organizations, is not applicable to labor unions, membership in which is often practically compulsory in the pursuit of a particular livelihood. But the rule was applied, and the *Donnelly* case quoted, in the case of "a large and powerful labor union", the *Grand International Brotherhood of Locomotive Engineers. Long v. Baltimore & Ohio R. R. Co.,* 155 Md. 265, 268, 279-280, 141 A. 504, 505. If, however, we should assume that the courts might scrutinize more closely the sufficiency of the grounds for expulsion of a member of a labor union than of a member of a social

club, by the same token a labor union should scrutinize closely the conduct of its officers and should not be denied power to discipline a faithless officer by expulsion from office and from membership. As we have already indicated, there are no allegations of facts amounting to fraud or arbitrary or illegal action in the disposition of the charges against plaintiff. If the scope of our review were broader than it is, plaintiff's explanation of his conduct would justify this expulsion.

It is unnecessary to pass upon plaintiff's contention that any provision for suspension without previous notice and hearing is unlawful. "Suspension", like many other words, has different meanings in different contexts. Sometimes suspension is a punishment—expulsion for a limited term. We do not suggest that any individual, association or corporation, in the circumstances of the instant case, is legally required to retain a faithless employee or officer in a position to continue his wrongdoing until after hearing of charges and a decision thereon. However, it is not necessary to decide any such question because, even if the suspension had been unlawful, the expulsion was not unlawful.

We have not mentioned the facts, or discussed questions of law, relating to "suspension" of Local No. 80 on March 4, 1947. The suspension continued a few months. Plaintiff in the bill complains bitterly about it. Determination that plaintiff's expulsion was not unlawful leaves him no status to maintain his bill in respect to the affairs of Local No. 80.

As required by Rule 36, the opinion of the lower court has been printed in appellant's appendix. It has also been printed in full in appellees' appendix. The last 29 pages of appellees' appendix are also a duplication of appellant's appendix. The cost of printing these duplications should not be taxed as costs.

*Decree affirmed, with costs except as stated.*